

LAURA E. DUFFY
United States Attorney
PHILLIP L.B. HALPERN
Assistant United States Attorney
California State Bar No. 133370
EMILY W. ALLEN
Special Assistant U.S. Attorney
California State Bar No. 234961
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9738
Fax:       (619) 546-0450
Email:     emily.allen@usdoj.gov

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>   vs.<br>AMIR HECHTER,<br><br>            Defendant. | Case No.: 14CR 2701-BEN<br><br>**INFORMATION** |

The United States Attorney charges, at all times material:

SECONDARY MORTGAGE MARKET FRAMEWORK

1.  In the United States, residential mortgage lenders typically sell the loans they originate to third-party investors, to the Federal National Mortgage Association (known as "Fannie Mae"), or to the Federal Home Loan Mortgage Corporation (known as "Freddie Mac"). By selling these loans, lenders reduce their credit risk and gain access to additional capital, which in turn provides borrowers with greater access to mortgage loans. This secondary mortgage market exceeds $10 trillion, and is essential to the healthy functioning of the American housing market and the American economy.

2. Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs"). CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies. These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3. This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4. As a result of the secondary market for mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans. As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate. The resulting complexity of mortgage securities products, the lack of regulation and ratings standards, and the abundance of credit availability are often cited as the causes of the financial collapse of 2008.

BACKGROUND ALLEGATIONS

5. Beginning in approximately 2004, Defendant AMIR HECHTER's brother, I.H., operated several San Diego businesses, including Blue View (which I.H. operated with a partner and the company's owner),

1 Ocean 18, LLC, Note Tracker Corp., Nationwide Servicing Center, and
2 Instant Mortgage Lending. I.H. operated these businesses along with
3 his brother, AMIR HECHTER, and his business associates, J.P. and J.C.

4     6. Through these businesses, I.H. participated in the
5 secondary mortgage market. I.H. purchased primarily distressed and
6 non-performing mortgages from primary lenders, and serviced the loans
7 by collecting payments from borrowers.

8     7. In addition to purchasing and servicing loans, I.H. pooled
9 these loans and sold shares of the pools to investors, primarily
10 friends and family, including AMIR HECHTER, their father Z.H., and
11 J.P. The investors would collect returns when borrowers made monthly
12 payments, paid off their mortgage loans, or after foreclosure on the
13 real property collateral.

14     8. AMIR HECHTER began participating as an investor in I.H.'s
15 companies in approximately 2004. At that time, AMIR HECHTER began to
16 work for I.H. servicing loans. In approximately 2006, AMIR HECHTER
17 moved to California to work with I.H. in his San Diego offices. In
18 approximately July 2012, AMIR HECHTER left his employment with I.H.'s
19 companies, and stopped investing further in the companies' loan
20 pools.

21     9. I.H. and his companies purchased mortgage notes from, among
22 other lenders, J.P. Morgan Chase ("Chase," also known as Bank One),
23 National City Bank ("National City"), and GMAC Mortgage, LLC ("GMAC,"
24 now known as Ally Bank). Chase, National City, and GMAC were all
25 financial institutions insured by the Federal Deposit Insurance
26 Corporation.

27     10. L.S. worked at Chase in the Residential Loan Department.
28 As part of her job, L.S. sold mortgage loans, including distressed or

non-performing second mortgages, to third-party investors, including I.H. Chase sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

11. E.J. worked at National City. As part of her job, E.J. sold mortgage loans, including distressed or non-performing second mortgages, to third-party investors, including I.H.

12. Robert Moreno ("Moreno") (charged elsewhere) worked at GMAC as a Market Manager. As part of his job, Moreno sold mortgage loans, including distressed or non-performing second mortgages, to third-party investors, including I.H. GMAC sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

COUNT ONE

18 U.S.C. § 371

(CONSPIRACY)

13. Paragraphs 1 through 12 are realleged and incorporated by reference herein.

14. Beginning in or around 2004, and continuing through at least in or around July 2012, in the Southern District of California and elsewhere, defendant AMIR HECHTER knowingly and intentionally joined a conspiracy with I.H. and others to commit Bank Bribery (in violation of Title 18, United States Code, Section 215) and Tax Evasion (in violation of Title 26, United States Code, Section 7201), knowing that at least one object of the conspiracy was to commit Bank Bribery.

## Purpose of the Conspiracy

15. It was the purpose of the conspiracy that AMIR HECHTER, I.H., and others would corruptly pay hundreds of thousands of dollars in bribes to L.S., E.J., and Moreno (hereinafter together, "the bankers"), which were paid in cash and otherwise concealed from the Internal Revenue Service ("IRS") to assist the bankers in evading federal income taxes on the illicit income, and, in return, the bankers would use their influence at the banks where they worked to ensure that I.H.'s bids to purchase mortgage loans were accepted.

## Manner and Means of the Conspiracy

16. To further the conspiracy, AMIR HECHTER, I.H., and others utilized the following manner and means, among others:

   a. The bankers would use their positions at the banks where they worked to ensure that I.H.'s bids were accepted. Among other things, the bankers would alter bids, reject bids, and erase or ignore bids from qualified competitors, and would provide I.H. inside information about prices and competing bids.

   b. In return, the bankers would corruptly accept hundreds of thousands of dollars in bribe payments from I.H. and his associates, including AMIR HECHTER, J.P., and Z.H.

   c. I.H. and others would arrange to pay the bankers by personal check, in hand-delivered cash payments, and through other methods designed to conceal the payments and to avoid reporting the payments to the IRS.

## Overt Acts

17. In furtherance of this conspiracy, and to carry out its objects, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

a. In or around 2004, I.H. told AMIR HECHTER that he had agreed with L.S. to pay bribes to L.S. in exchange for her assistance ensuring that I.H.'s bids to purchase loans from Chase were accepted.

b. In or around 2004, AMIR HECHTER invested money in pools of mortgages purchased from Chase, and knowingly reimbursed I.H. for a portion of the bribes paid to L.S.

c. In or around 2008, I.H. told AMIR HECHTER that he had agreed with E.J. to pay bribes to E.J. in exchange for her assistance ensuring that I.H.'s bids to purchase loans from National City were accepted.

d. In or around 2008, AMIR HECHTER invested money in pools of mortgages purchased from National City, and knowingly reimbursed I.H. for a portion of the bribes paid to E.J.

e. In or around late 2011, I.H. told AMIR HECHTER that he had agreed with Moreno to pay bribes to Moreno in exchange for his assistance ensuring that I.H.'s bids to purchase loans from GMAC were accepted.

f. In or around late 2011, AMIR HECHTER invested money in pools of mortgages purchased from GMAC, and knowingly reimbursed I.H. for a portion of the bribes paid to Moreno.

g. In or around March 2012, I.H. asked AMIR HECHTER to write a personal check to Moreno, as payment for some of the loans I.H. purchased from GMAC. AMIR HECHTER agreed.

h. On or about March 7, 2012, AMIR HECHTER wrote a personal check for $50,000 to Moreno, drawn on AMIR HECHTER's personal bank account.

i.   On or about March 28, 2012, AMIR HECHTER wrote a personal check for $5,000 to Moreno, drawn on AMIR HECHTER's personal bank account.

        j.   On or about April 16, 2012, AMIR HECHTER wrote a personal check for $7,000 to Moreno, drawn on AMIR HECHTER's personal bank account.


All in violation of Title 18, United States Code, Section 371.

DATED:  9/19/2014

LAURA E. DUFFY
United States Attorney

PHILLIP L.B. HALPERN
Assistant United States Attorney

EMILY W. ALLEN
Special Assistant U.S. Attorney